## BROBST *v.* BROCK.

1. If for any reason appearing in the record it is clear that a plaintiff in error, who was also plaintiff below, cannot recover in the action, the court will not determine whether error was committed in instructions given to the jury respecting other parts of the case. To warrant the reversal of a judgment, there must not only be error found in the record, but the error must be such as may have worked injury to the party complaining.

2. A mortgagor of land, as between himself and his mortgagee, has only an equitable title. He cannot, therefore, recover in ejectment against the mortgagee in possession, after breach of the condition, or against persons holding possession under the mortgagee.

   *Quære,* whether such a suit can be maintained until redemption, even though the money secured by the mortgage has been paid or tendered.

3. Twenty-five adjoining tracts of wild and uninhabited land, surveyed in a block, and separated by no marks on the ground, were purchased from the commonwealth by one person at one time, and subsequently conveyed by him as an entirety by one deed. His grantee also conveyed them as a whole by one deed, and the second grantee mortgaged them as a whole in the same way. After the debt secured by the mortgage fell due, the mortgagee placed a tenant upon the lands, whose actual occupancy, or *pedis possessio,* did not extend beyond the limits of a single tract.

   *Held,* that the possession of the whole body of land, as described in the deed, must be presumed to have been taken by the mortgagee in right of the mortgage.

4. An irregular judicial sale made at the suit of a mortgagee, even though no bar to the equity of redemption, passes to the purchaser at such sale all the rights of the mortgagee as such.

5. No presumption of payment of a mortgage can arise from lapse of time against a mortgagee or his assigns in possession, when the mortgagor became insolvent and died before the debt fell due, and when his vendee of the equity of redemption also became insolvent before the maturity of the debt, removed from the State, and never afterwards returned.

ERROR to the Circuit Court for the Eastern District of Pennsylvania, the suit below being an ejectment for an undivided fourth of a tract of land, and the case being this:

The tract for a fourth of which the ejectment was brought, was the easternmost of twenty-five adjoining tracts in Pennsylvania which were surveyed in 1793, on warrants issued the same year, and for which separate patents were issued

on the 9th and 10th of May, in 1816, to one George Grant, who in the same year conveyed the whole, forming a tract of 10,000 acres, to Thomas B. Smith. Smith conveyed the whole in undivided fourths, on the 27th of September, to Michael Brobst and three other persons, one-fourth to each. On the 6th March, 1817, Brobst mortgaged his undivided fourth to Samuel Wood, for $1500, payable on the 1st of April, 1821; the mortgage being properly recorded. The deeds of both Grant and Smith, and the mortgage of Brobst described the land collectively as one tract.

Michael and John Brobst were brothers, and were engaged in partnership in making iron in Berks County, in the eastern part of Pennsylvania. They failed in business, and confessed several judgments, among them one, January 17, 1817, for $1000, to Jacob Kutz and Jacob Levan.

On the 15th May, 1817, Michael Brobst conveyed to his brother, John Brobst, his undivided fourth of the twenty-five tracts and went to Illinois, where he died, in 1820, never having married; news of his death being brought to Pennsylvania about 1823.

John Brobst left the eastern parts of Pennsylvania, where he lived, about the year 1820, went to distant parts of the State for a short time, and in 1824 out of it to Maryland. His place of residence was unknown to his relatives in Pennsylvania. He was supposed to be dead, and about the year 1847, letters of administration on his estate were issued; though in point of fact he did not die till 1861.

The mortgage already mentioned as given in 1817 by Michael Brobst to Wood, having been assigned in the same year by Wood to a certain Dunn, and by him to one Boyer, Boyer on the 3d of November, 1825, proceeded by the mode usual in Pennsylvania, where mortgages are recorded, and considered, in some respects, as records, to foreclose it; that is to say, he issued upon it a writ of *scire facias*, under an act of 1705.

By this old act the mortgagee is authorized a year and a day after the mortgage is payable, to sue forth, if it remains unpaid, a writ of *scire facias* from the Court of Common

Pleas, of the county where the mortgaged premises lie, directed to the proper officer, requiring him, by honest and lawful men of the neighborhood,

" To make known to the *mortgagor, his, her, or their heirs, ex-ecutors or administrators,* that he or they be and appear before the magistrates, judges, or justices of the said court or courts, to show if anything he or they have to say wherefore the said mortgaged premises ought not to be seized or taken in execution for payment of the said mortgage-money, with interest, &c. . . . And if the defendant in such *scire facias* appears, he or she may plead satisfaction or payment of part or all the mortgage-money, or any other lawful plea; but if such defendants in such *scire facias* will not appear on the day whereon the writ shall be made returnable, then, if the case be such as damages only are to be recovered, an inquest shall forthwith be charged to inquire thereof, and the definitive judgment therein as well as all other judgments to be given upon such *scire facias* shall be entered, that the plaintiff in the *scire facias* shall have execution by *levari facias*, directed to the proper officer, by virtue whereof the said mortgaged premises shall be taken in execution and sold," &c.

The writ issued as already mentioned was directed against "Michael Brobst with notice to *terre tenant*," and confessedly was not served in the way the most proper. There was no personal service upon the mortgagor, who in fact was dead, nor any upon his heirs or representatives, nor any upon the true *terre tenant*, that is to say, upon John Brobst; the holder of the title being the only person regarded in Pennsylvania as falling within that designation. Neither was this want of actual service supplied by a return of two *nihils*, which in Pennsylvania are commonly regarded as the equivalent of service. The return was thus:

"Served upon Jacob Rodeberger, *terre tenant*, 21 miles. *Sci. fa. sur mortgage*, debt $3000. March 29, 1826, judgment *lev. fac.* July Term, 1826, 46."

Upon this irregular service, judgment was entered on motion that the mortgaged lands be sold to satisfy the debt. And

upon this judgment all the mortgaged property was sold on the 22d March, 1828, to one Charles Frailey, to whom a sheriff's deed was made; Frailey purchasing at the request of Boyer, assignee of the mortgage, and with his money. He subsequently conveyed to John Smull, whose title became vested in Brock and others, defendants in the case.

The body of lands patented to Grant were uninhabited until about 1824, when one Philip Rodeberger erected a small log tavern in what was still a wilderness, upon a tract adjoining the tract whose fourth part was here sued for, and cleared an acre or two of ground.

In 1834 a partition of some sort, valid or invalid, was made of the four undivided fourths of the whole twenty-five tracts, and the parties who had been originally co-owners with the Brobsts took what they considered their own purparts in severalty.

No further improvements than Rodeberger's were made on any of the purparts until 1847, when the owners of some of the purparts (not derived through the Brobsts) laid out towns, began building railroads, opening coal mines, and making extensive and costly improvements, which had been continued to the present time, when not less than ten thousand people live in the various towns laid out on the land—with their churches, halls, manufactories, stores, school-houses, dwellings, cemeteries, &c., &c.

About the year 1848, possession was taken of the purpart allotted to the Brobst alienees, by the present defendants, and those from whom they derived title, who had paid taxes from that time to the present; and on these purparts, also, similar improvements had been made and hundreds of houses and other buildings erected, and inhabited by a large population, and more than half a million of dollars expended in mining improvements.

In this state of things the heirs and devisees of John Brobst brought the present ejectment, A.D 1865, against Brock and others to recover, as already stated, an undivided fourth of one of the tracts; one warranted in the name of Deborah Grant.

In addition to the title made, as already stated, under the mortgage, the defendants asserted that they were possessed of a title under the partition made in 1834; also by virtue of a sheriff's sale of the property under the judgment of Kutz and Levan, already mentioned as entered against the Brobsts, also under a tax sale, as the property of John Brobst, of the particular lot sued for.

Every one of the titles set up by defendants, including all the last-mentioned titles, were disputed by the plaintiff, as irregular, null, and void.

The court below (GRIER, J.) charged that the title set up under the partition was good enough, as also that set up under the judgments of Kutz and Levan. In regard to the title set up under the mortgage, he said that it was not necessary to decide whether those proceedings were regular and sufficient to extinguish the equity of redemption and vest a title in the purchaser; but that admitting that they might have been set aside or could be, it was first necessary to show that the mortgage debt was paid or offered to be paid, which was not shown; that as to redemption now, more than thirty years had elapsed, during which time John Brobst, the owner of the equitable title, had taken no step to assert or establish his right to redeem. That in such case the presumption of law was that he had released his equitable right, and equity would give him no remedy after his sleep of thirty years. " He must now," said the court, " as plaintiff in this case, show a legal title. He has shown no valid title, either legal or equitable."

Judgment having gone for the defendant, the plaintiff brought the case here.

It was fully and ably argued on all the points decided below; *Messrs. G. W. Woodward, Brent, and Crittenden, for the plaintiff,* contending that the partition of 1834, the sale under the judgment of Kutz and Levan and the purchase at the tax sale were severally void; *Messrs. George W. Biddle and J. P. Brock,* on the other side, supporting their case under those titles. The ground, however, upon which this court rests the

case, avoiding, as it does, any decision on those points, report of this argument would be useless. On the other point, the title derived under the mortgage, the ground taken was thus:

*For the plaintiffs:*

I. The defendant sets up title through a purchase under a statutory foreclosure of a mortgage. The proceeding under the Pennsylvania act is one *in rem* and *strictissimi juris.* For every reason, therefore, the party setting up the foreclosure must show a compliance with the statute. Now, here the writ was issued against the mortgagor. But *he,* confessedly, was dead at the time, and of course was not served. His "heirs, executors, and administrators," the parties mentioned in the act, are nowhere referred to in writ, service, judgment, or other part of the record. These are not irregularities but fatal defects.

Is the matter helped by the service upon Rodeberger, "*terre tenant?*" The act does not speak of *terre tenants,* nor does it authorize any such service; though by the Pennsylvania practice, besides service upon the mortgagor, notice is sometimes given to the *terre tenant.* But service upon Rodeberger amounted to nothing; because—

1. He was not tenant of anything, but of one tract, and *that* tract was not the one sued for, but a tract at best adjoining it. It is impossible to consider the possession of a person thus putting himself down on one tract, surveyed specifically, and patented by a patent defining its dimensions, as working a possession of twenty-four other tracts. He occupied but a spot even on the tract where he was. It is difficult to regard such possession as extending even to *its* boundaries. The case of *Ellicott* v. *Pearl,* in this court,* sustains our views.

2. He was not *terre* tenant of even the spot where he was. A *terre* tenant is the holder of the title to the ground; and the reason why notice is given (when it is given) to *him,* is in order that if he has any title, other than that derived

---

* 10 Peters, 412.

through the mortgagor, he may come in and set it up *in defence to the scire facias,* when the mortgagee is about to take possession as owner under his mortgage.

Everything was void, therefore, in form, without the least alleviation in substance.

II. After such a lapse of time as exists here, the debt of Brobst must be presumed to be paid. And, if all were regular in form, instead of being fatally defective, the defendants stand in the position of parties claiming under a mortgage actually satisfied.

*Contra, for the defendants:*

The judgment on the mortgage was but erroneous, not void. The proceeding was not upon an original cause of action, but upon that which was the equivalent of a record of the court, namely, a mortgage acknowledged and recorded and already a lien on the defendant's property. The judgment was not that the plaintiff should recover a sum of money, &c., from the defendant, as in ordinary cases, but in the language of the act of 1705, that the defendant, the mortgagor, &c., should show, if he could, wherefore the said mortgaged premises ought not be seized and taken in execution for the said mortgage debt. The writ of *scire facias* was therefore substantially mesne process, and required no personal service; for, by the well-known practice, the sheriff was only bound to make reasonable efforts to find out the mortgagor (he not being entitled of right to personal notice), and these reasonable efforts being made, he was considered to have had notice of the intended taking in execution of the mortgaged premises. It is only under this theory that two returns of *nihil habet* are regarded as the equivalent of the return of service. In such a proceeding, therefore, the personal knowledge of the defendant of the writ was not necessary, and its absence did not vitiate the proceeding. It has been decided in *Allison* v. *Rankin** that one return of *nihil* was enough to prevent the judgment being void or im-

* 7th Sergeant & Rawle, 269, and see Feger v. Keefer, 6 Watts, 297.

peachable collaterally; but there is no difference in reality between a return, that the defendant cannot be found, and an omission to state this fact in the return by the sheriff. In *Warder* v. *Tainter*,\* the court say:

"But is it necessary that the court should have jurisdiction of the person in a proceeding by *scire facias* upon a mortgage? If it be, then, I apprehend that many judgments and sales of mortgaged land, made under them, that have hitherto been considered valid, are void."

We have in this case, as in *Allison* v. *Rankin*, a judgment in a court of record having jurisdiction of the subject-matter, in full existence when the *levari* issued. We have also the additional fact apparent, that before this judgment was entered, the sheriff had gone upon the land to look for the mortgagor, for the purpose of serving the writ upon him. This is plain, from the return of service upon the only person then in possession of this undivided portion of twenty-five tracts. No partition had then been made, and, of course, Michael or John Brobst's interest was, as to his undivided fourth, commensurate with the extent of all the tracts. The judgment was, therefore, valid to sustain a sale made under it. But suppose, for the sake of argument, that the judgment in question did not authorize the issuing of a writ of *levari* upon it, what then is the case? We have a mortgagee solemnly asserting, by the process of the law, that the mortgage debt was unpaid, and that he was entitled to take the mortgaged lands in execution. We have a writ of execution issued upon a judgment containing this assertion; also a sheriff's sale, and a deed under it, carrying into consummation this assertion, so far as the mortgagee is concerned. In the face of this assertion, published to the whole world in the form of a judicial proceeding, we find no counter assertion by the mortgagor for nearly forty years. No attempt is made by him, or his heirs, or by his alienee, in all this period, either to review the proceeding or to impeach it in

\* 4 Watts, 277.

any way, or to enter upon the mortgaged land, or to pay the taxes upon it, or to exercise any act of dominion or ownership over it. The sheriff's vendee was the mortgagee claiming to be in possession under a foreclosure of a mortgage. He stood ready, in all this time, to contest the right of the mortgagor, or those claiming under him to redeem. At the end of twenty years, the right of a mortgagor, to redeem, or against a mortgagee claiming to be in possession, is barred. Their right, therefore, to redeem, now is gone. In *Slicer* v. *Bank of Pittsburg*,[*] on a question of the right of mortgagors to redeem land, which, by improvements and the general increase of the value of real estate, had become of great value, the court dwell with emphasis upon this state of things. They say:

"Thirty years have elapsed since it was sold, under the appearance, at least, of judicial authority."

And cases are cited to show that twenty years' undisturbed possession, without any admission of holding under the mortgage, or treating it as a mortgage, during that period, is a bar to a bill to redeem.

*Reply:* The case and argument of the other side assume that John Brobst, finding himself insolvent, left the State years ago, and after these lands had been applied to the payment of his debts and taxes, bought by honest purchasers, and coal veins opened, towns and railroads built, and expensive improvements erected, that he is aroused from his sleep of years, and comes to reclaim his abandoned property. But that is not the true case. The true case is that of an unfortunate man who, believing that his fourth part of inaccessible, untaxed, mountain land, was worthless, left his native State to seek a home among strangers, and was overtaken by death; then a rush of speculators to these immense fields; hunters of void executions and worthless papers, and the seizure of the lands of the absentee upon less than twenty

---

[*] 16 Howard, 571.

years' possession, to bar the true owner. If the defendants are even now ejected, they will retire enriched by nearly twenty years of lucrative trespass.

Mr. Justice STRONG delivered the opinion of the court.

Much of the very elaborate argument addressed to us on behalf of the plaintiff in error was directed to the consideration of questions not necessary to the decision of this case. Whether the judgment in the *scire facias* upon the mortgage was absolutely void, or only irregular, we are not called upon now to determine, for on the trial of the case in the court below no effect was allowed to it. The learned judge who presided at the trial did not rule that the judgment was valid, or that the sale made under it divested the equity of redemption of the mortgagor, or of John Brobst, to whom the equity had been conveyed. It is true the defendant set up that he had acquired title under that sale, and, had that been his only defence, it would be necessary to consider whether it was sufficient to extinguish the equity of redemption. But there were several other defences, two of which the court below ruled sufficient to protect the defendant in his possession. If the ruling was correct, or if either of these defences was perfect, it matters not what may have been the instruction given to the jury respecting other parts of the case. It would be idle to reverse the judgment and send the case back for a new trial if it be certain that the plaintiff cannot recover in the action. In *Greenleaf's Lessee* v. *Birth*,* it was stated to be "a general rule that where there are various bills of exceptions filed according to the local practice, if, in the progress of the cause, the matters of any of those exceptions become wholly immaterial to the merits as they are finally made out at the trial, they are no longer assignable as error, however they may have been ruled in the court below. There must be some injury to the party to make the matter generally assignable as error." So in *Campbell's Executors* v. *Pratt et al.*,† the court refused

---

* 5 Peters, 135.                    † 2 Id. 354.

to reverse a decree of the Circuit Court, although an error had been committed, as no benefit could result to the appellant from the reversal.

Without noticing, therefore, for the present at least, the particular exceptions taken in the court below, we proceed to inquire whether the record exhibits any insuperable obstacle to the plaintiff's recovery in this action. Both parties claim under Michael Brobst, who, on the 27th day of September, 1816, became the owner of one undivided fourth part of twenty-five adjoining tracts of land, of which the tract now in controversy was a part. The whole body was then, and during many years thereafter, wild, uncultivated, and uninhabited. While thus, the owner, Michael Brobst, on the 6th day of March, 1817, mortgaged his interest in the entire body of lands to Samuel Wood to secure the payment of fifteen hundred dollars, with interest, on the 1st day of April, 1821. This mortgage, by subsequent assignments made in the same year, became the property of Boyer. On the 15th of May, 1817, after the execution of the mortgage, Michael Brobst conveyed his remaining interest in the lands to John Brobst in fee, who does not appear ever to have made any entry upon them, or to have claimed possession prior to his death, which occurred in 1861. It is as an heir and devisee of John Brobst that the lessor of the plaintiff claims. The defendants claim under Wood, the mortgagee, through Boyer, the assignee of the mortgage. They also set up several other titles, which it is not necessary now to notice. It thus appears that what John Brobst acquired by the deed of Michael Brobst to him was only an equity of redemption. As between his grantor and Wood, or Wood's assignees, the legal title was then in the latter, and so it continued notwithstanding the conveyance of the equity of redemption to John Brobst.

It is true that a mortgage is in substance but a security for a debt, or an obligation, to which it is collateral. As between the mortgagor and all others than the mortgagee, it is a lien, a security, and not an estate. But as between the parties to the instrument, or their privies, it is a grant

which operates to transmit the legal title to the mortgagee, and leaves the mortgagor only a right to redeem. Formerly, if the condition was not strictly performed, the estate of the mortgagee, at first conditional, became absolute, and the mortgagor's right to redeem was lost. The estate or interest, though defeasible at its inception, became unconditional on the failure of the mortgagor to pay the money secured, or fulfil the condition at the time appointed for performance.*

Courts of equity have in modern times relieved against such forfeitures, and, in favor of a mortgagor, have extended the time for redemption. But such courts, as fully as courts of law, have always regarded the legal title to be in the mortgagee until redemption, and bills to redeem are entertained upon the principle that the mortgagee holds for the mortgagor when the debt secured by the mortgage has been paid or tendered. And such is the law of Pennsylvania. There, as elsewhere, the mortgagee, after breach of the condition, may enter or maintain ejectment for the land. And having entered he cannot be dispossessed by the mortgagor so long as the mortgage continues in force. Applying these principles to this case it is plain that John Brobst, having acquired only an equity by the deed from Michael Brobst, neither he nor his heirs can recover in ejectment against those in possession under the mortgagee while the mortgage remains in existence, or until there has been a redemption.

It is true that in the State courts of Pennsylvania ejectment may be maintained upon an equitable title, but such has never been the rule in the Federal courts. It becomes, therefore, a material inquiry whether the legal title which was in Wood has ever been acquired by John Brobst or his heirs, and also whether the defendants are in possession under Wood, and in virtue of the mortgage. It has already been noticed that Boyer became the assignee of the mortgage in 1817. It was assigned by Wood to Dunn, and by

---

* Powell on Mortgages, 9–10; 2 Blackstone's Commentaries, 158; Littleton, 332.

Dunn to Boyer. The assignments were undoubtedly suffi-
cient to transmit the rights and estate of the mortgage.
When the debt secured by the mortgage fell due in 1821,
no effort was made to redeem, and none has been made to
the present day. There is no evidence that any one was in
actual possession of the lands before 1821, or at any time
before the condition of the mortgage was broken. But
after that time Boyer had possession by his tenant, Roder-
berger, who occupied a house upon the body of lands mort-
gaged, certainly as early as 1825. In regard to this there is
no dispute and no contradictory evidence. It is true Roder-
berger was resident upon one of the twenty-five tracts which
adjoins the tract now in dispute. But, though for the pur-
pose of acquiring title from the commonwealth several pat-
ents were taken, they described collectively but one tract.
Several patents were required under the law of the State
when there were, as in this case, several warrants. The war-
rants were each issued for four hundred acres, and an allow-
ance of six per cent., and the law required the patents to
follow the surveys made on each warrant. The whole
twenty-five tracts belonged to one person. They were all
patented to George Grant on the 9th and 10th days of May,
1816, and they adjoined each other, so as to constitute one
tract or body. Grant sold them together, as a whole, to
Smith, who in turn sold an undivided fourth part of the
whole body to Michael Brobst by one deed. So Michael
Brobst mortgaged his entire estate in the whole to Wood,
and conveyed his equity of redemption by one deed to John
Brobst. From the beginning the entire body of land was
treated as one subject of grant or mortgage, though held
under several conveyances. After Grant became the owner
nothing in the title ever separated the tracts before Boyer
took possession. Having been paid for originally by one
person, and one warrant calling for another as an adjoiner,
it is not probable the interior lines of the block were ever
run. We have not the surveys before us, but when surveys
in Pennsylvania are laid in a block (that is so as together to
constitute one tract), under warrants issued at the same time

and calling for each other, it is not required, nor is it usual, that the surveyors run more than the exterior lines.

It is then to be presumed there was nothing upon the ground to distinguish one part of the entire body from any other part, and the mortgage treated it all as one hypothecation. The entry of Boyer, therefore, by his tenant, Rodeberger, upon any part of this large tract must be held to have been an entry upon the whole, a taking possession of the whole. There is nothing in *Ellicott* v. *Pearl*,* in conflict with this. On the contrary it was there held, as had been frequently held before, that one, entering under color of title by deed, is deemed to have taken possession coextensive with the bounds of the deed, that is, of all the land conveyed by the deed, if it is not in any adverse possession. Here Boyer entered under a deed. Having a right to enter only in virtue of the mortgage of which he was assignee, it is a legal presumption that his entry was in right of it, under color of his title, and that he intended to assert his claim to the entire subject of the grant. It follows that the entry transferred the possession of the whole body of the land from John Brobst to Boyer, and that no matter where his *"pedis possessio"* was taken, he acquired possession to the extent of the mortgage deed. There is no distinct evidence how long he continued an actual occupation by his tenants. It is enough that Brobst never afterwards sought to regain possession, and the presumption of law therefore is that the possession remained in Boyer so long as his rights under the mortgage continued. On the 3d of November, 1825, he caused a *scire facias* to be issued under the statute law of the State against the mortgagor, with notice to *terre tenants*, requiring them to show cause why the lands should not be sold, and the proceeds of sale applied to the payment of the debt. This writ was not served upon the mortgagor, or upon John Brobst, the owner of the equity of redemption, The sheriff's return was, "Served upon Jacob Rodeberger; *terre tenant.*" Nevertheless a judgment was entered on mo-

---

* 10 Peters, 412.

tion. That judgment was, that the lands mortgaged be sold to satisfy the debt. Had the judgment been authorized, even though erroneously entered, a sale under it would have passed to the purchaser both the interest of the mortgagee in the lands and the equity of redemption then in John Brobst.

But it is contended the judgment was void in law because no service of the *scire facias* was made upon the mortgagor, or the actual *terre tenant*, John Brobst (no one but the holder of the title being recognized as a terre tenant), and because there was no return of " *Nihil* " in default of such service. We shall not discuss that. Assuming that the objection is well taken, and so it was assumed in the court below, it is still true that the record exhibited a formal judgment. Upon this a writt of *levari facias* was issued, and all the lands de-scribed in the mortgage were sold under it to Charles Frailey, on the 22d of March, 1828, to whom a sheriff's deed was duly made. Frailey purchased at Boyer's instance, with Boyer's money, and, of course, for Boyer. Subse-quently, at Boyer's request, he conveyed the property to John Smull, whose title the defendant, Brock, has. In re-gard to all this there is no controversy. The evidence sub-mitted by the plaintiff shows how Frailey purchased and conveyed. Now, the worst that can be said of the sheriff's sale under the judgment so obtained is, that it did not pass the title to the equity of redemption; that it did not operate as a foreclosure of the mortgage. But did it not, in con-nection with Frailey's deed to Smull, made at Boyer's in-stance, and the subsequent conveyances by which Brock became invested with the title, operate to transmit to Brock the rights of the mortgagee? We think it did. It would be " passing strange " if Boyer, after having requested Frailey to buy at the sheriff's sale, and after having fur-nished him with the money to purchase, and directed him to convey to Smull, could have asserted his mortgage against Smull or Smull's grantee. Beyond-question the conveyance by Frailey under the circumstances was a conveyance in effect by Boyer, and it passed all the right to the land which

Boyer had.   It is not necessary to this conclusion that we should hold the sale under the judgment cut off the equity of redemption.   We express no opinion upon that subject. It is enough that an irregular or a void judicial sale, made at the instance of a mortgagee, passes to the purchaser all the rights the mortgagee, as such, had.   For this authority is hardly needed.   We may, however, refer to *Gilbert* v. *Cooley,** where it was held that though a statutory foreclosure of a mortgage be irregular, and no bar to the equity of redemption, yet the purchaser at the sale succeeds to all the interest of the mortgagee.   In that case there was no evidence that the purchaser bought at the instance of the holder of the mortgage.   *A fortiori,* must one who has bought from the mortgagee, or from a purchaser at such a sale for the mortgagee, as in this instance, obtain all the rights which the mortgagee held.   To the same effect as *Gilbert* v. *Cooley* is the case of *Jackson* v. *Bowen and Neff.*†   If, therefore, it could be held that Boyer's possession, through his tenant, Roderberger, did not, of course, extend over the Deborah Grant tract (which is the tract in contest in this suit), it would still be established that the defendants are assignees of the mortgage in possession.   The principal defendant, Brock, consequently, is clothed with the rights of the mortgagee.   He is protected by the legal title, even though it be, conceded that the equity of redemption is still in existence. From 1821 to 1861, the date of John Brobst's death, and, indeed, until 1865, when this suit was brought, no claim for redemption was ever asserted.   As a general rule, a mortgagor, after his mortgagee has been in possession twenty years, cannot be heard in advancing a claim to redeem.   As was said in the court below, it is presumed he has released his equity.   A chancellor will not entertain stale claims.   It is true that in most cases where this doctrine has been avowed the mortgagee had been in continued actual occupancy, having not merely a right, but a *pedis possessionem.* But the cases are not rested upon that ground, nor is it easy

---

* Walker's Chancery, 494.        † 7 Cowen, 13.

to see how that can make any difference in the rule when the mortgagor is out of possession, and knows, or is bound to know, that a right is asserted against him. The refusal of a court of equity to interfere is because of the laches of the holder of the equitable right, and a sleep of forty years such as there was in this case, may well raise every presumption against a claim merely equitable. All such rights are imperfect, and hence they must be asserted with vigilance.

It was said in the argument, on behalf of the plaintiff in error, that the lapse of more than twenty years raised a presumption that the mortgage had been paid, and that the mortgagee's rights had been extinguished before this suit was brought. No such point appears to have been presented in the court below, and hence it ought not to be mooted here. But how any such presumption can arise against a mortgagee, or his alienee, when he has been in possession under the mortgage, we have not been shown. Even if it could, it was completely rebutted in this case by the evidence submitted by the plaintiff in error. It was proved, without contradiction, that Michael Brobst, the mortgagor, became insolvent, and died in 1820, before the mortgage debt became due, never having been married, and leaving no personal representatives, and none but collateral heirs. John Brobst, his alienee, also became insolvent, removed to the western part of the State, and thence to Maryland in 1827, where he resided until his death in 1861, never having returned to Pennsylvania, so far as it appears, and having been supposed to be dead. These facts, shown by the plaintiff, were quite enough to repel any presumption of payment arising from the lapse of time. Had they been submitted to the jury, it would have been their duty to find that the legal presumption, if any could arise under the circumstances, was rebutted. To this the authorities are numerous.[*]

---

[*] Filadong v. Winter, 19 Vesey, 196; Blacket v. Wall, 3 Meeson & Roscoe, 119, note; Daggett v. Tallman, 8 Connecticut, 176; Newman v. Newman, 1 Starkie, 81; Shields v. Pringle, 2 Bibb, 387; Boardman v. De Forrest, 5 Connecticut, 1; Bailey v. Jackson, 16 Johnson, 210; Godhawk v. Duane, 2 Washington Circuit Court, 323.

The defendant, Brock, then, if all his other titles are shut out of view, is, as has been said before, in the position of a mortgagee in possession, and the lessor of the plaintiff has at most only an equity of redemption—an equity more than commonly stale.   From 1825, when Rodeberger was certainly in possession under Boyer, until 1865, when this suit was brought, no attempt was made to assert the equity or to redeem the land.   Meanwhile extensive improvements have been made upon the property, and it has been converted from a wilderness to a populous settlement.   It is hardly probable that at this late day a bill to redeem would be entertained by any chancellor.   But this we need not now decide.   It is sufficient that there has been no redemption.   It has been held that ejectment will not lie at the suit of a mortgagor against his mortgagee in possession, after breach of the condition, even if the money secured by the mortgage be paid or tendered.   This was said by the Supreme Court of Massachusetts in *Hill* v. *Payson et al.*,\* and solemnly decided by the same court in *Parsons* v. *Wells et al.*,† where may be found a thorough discussion of the subject.   The doctrine of that case is, that the only remedy for a mortgagor or his assignee, after payment of the debt, if the mortgagee, having entered for condition broken, refuses to relinquish possession of the mortgaged premises, is by bill in equity.   This was shown to be in accordance with the rules of the common law, as well as implied in the statutes of the State, and this seems to rest upon correct principles.   If it were not so, a mortgagor might remain quiet until his mortgagee in possession (the property being unimproved, as in this case) had made improvements necessary for obtaining any income therefrom.   He might then tender the debt and interest, and recover the possession without making any compensation for the improvements. The mortgagee in such a case would have no remedy for his disbursements.   But if the mortgagor must file a bill to redeem, asking for equity, he may be compelled to do equity.

---

\* 3 Massachusetts, 559.          † 17 Id. 419.

Hence, there is justice and fitness in. holding that the legal title remains in the mortgagee until redemption, though the debt has been paid. It is observable that the statute of 7 Geo. II, ch. 20, enacted that a mortgagee shall not maintain ejectment, after payment or tender by the mortgagor of principal, interest, and costs. There could have been no necessity for such an enactment if the legal title had not remained in the mortgagee. The point has never been decided by this court, but in *Gray* v. *Jenks*,\* Judge Story intimated at least that such was his opinion, though the case did not call for such a decision. It is true a different rule is said to prevail in New York from that held in Massachusetts, but it is not the rule of the common law, nor can it be so promotive of justice.

This is all that need be said of the case. Were it conceded that the Circuit Court was in error in instructing the jury that the sale under the Kutz and Levan judgment passed whatever title John Brobst had (which we do not assert), or that the rulings respecting the partition and the tax title were erroneous, it would not avail the plaintiff in error, because, for the reasons mentioned, there can be no recovery in this action.

JUDGMENT AFFIRMED.