## DECK v. WHITMAN et al.

(Circuit Court, E. D. Tennessee, S. D. October 14, 1899.)

1. FORECLOSURE OF MORTGAGES—MODE OF CONVEYING TITLE—POWERS OF FEDERAL COURTS.

The established general practice in this country, in judicial sales upon foreclosure, is to direct sale to be made by a master named in the decree, and, when the sale upon report is confirmed, to order a conveyance of the property by the master to be delivered to the purchaser; and courts of the United States, in adopting such practice, are not restricted by the maxim that jurisdiction in equity is ordinarily exercised in personam, and their power confined to the ordering of a conveyance by the parties, a foreclosure suit being substantially a proceeding in rem.[1]

2. SAME—ADOPTION OF STATE PRACTICE.

In a suit for the foreclosure of a mortgage upon real estate situated within the jurisdiction of the court. it is the right and within the power of a circuit court of the United States, if not its duty, to conform to any statutes of the state regulating the remedy for the enforcement of the mortgage contract.[2]

---

[1] A mortgagee, selling under his power of sale, can make a good title to the purchaser without the concurrence of the mortgagor. Corder v. Morgan (1811) 18 Ves. 344; 4 Kent, Comm. p. 147.

[2] As to mortgage foreclosures in the federal courts, see note to Seattle, L. S. & E. Ry. Co. v. Union Trust Co., 24 C. C. A. 523.

This was a suit in equity for the foreclosure of a mortgage. On settlement of decree after confirmation of sale.

Garnett Andrews, for complainant.
J. Hodge McLean, for defendants.

CLARK, District Judge. The bill in this cause was brought for foreclosure of a mortgage. The real estate on which the mortgage rested has been regularly sold by the special master pursuant to the terms of the decree, and, motion to confirm having been allowed, the question of proper provisions in the decree, as to the method of passing title to the purchaser, has been suggested by the special master.

The practice in this court for years has been in substantial conformity with the statutes of the state regulating the practice of courts of chancery in sales upon foreclosure. The statutory provisions found in Shannon's Code of 1896 are as follows:

"Sec. 6301. The decree may devest the title to property, real or personal, out of any of the parties, and vest it in others, and such decree shall have all the force and effect of a conveyance by such parties, executed in due form of law.

"Sec. 6302. The court may also appoint a commissioner to execute all necessary conveyances, releases, and acquittances, either in his name or in the name of the parties, as the court may think proper; and the instrument so executed will be as valid as if executed by the party.

"Sec. 6303. If the decree direct a conveyance, release or acquittance to be made, and the party against whom the decree is rendered fails or refuses to execute the same in the time specified in the decree, or in a reasonable time, if no particular time is thus specified, the decree operates in all respects as if the conveyance, release, or acquittance was made."

It is well known that there is now pending before the supreme court of Tennessee a case which involves the question of the power of this court, by decree, to devest and vest title, and to direct conveyances, by a special commissioner or master appointed for that purpose. The contention before that court is that a circuit court of the United States is without power to devest or vest title, or to pass title, by directing a conveyance in substantial conformity to the statutory regulations of the state upon that subject.

It has been the established practice of the courts of the United States in this district to execute decrees of sale and pass title in this method, which is the practice now generally prevailing in this country. The supreme court of this state having intimated a doubt as to the power of this court, by decree, to devest and vest title, or to order a conveyance, by special master or commissioner, the deservedly high character of that court gives to the question at once a serious import. It is said that the contention before that court is that the practice in the circuit courts of the United States is regulated by the practice of the high court of chancery in England, and that, under the English practice, power exists only to order a conveyance by the parties to the suit. In the examination of such a question, the distinction between questions of equity jurisdiction and jurisprudence and those of practice must be closely observed. The equity jurisdiction conferred on federal courts, in

the absence of an act of congress, is the same as that of the high court of chancery in England at the time of the adoption of the judiciary act of 1789. Pennsylvania v. Wheeling & B. Bridge Co., 18 How. 462; Fontain v. Ravenel, 17 How. 384; McConihay v. Wright, 121 U. S. 206, 7 Sup. Ct. 940. And the test of equity jurisdiction in the courts of the United States, in the absence of an act of congress, is determined according to the English system, as administered in 1789. Id.; Alger v. Anderson, 92 Fed. 696; Mississippi Mills v. Cohn, 150 U. S. 202, 14 Sup. Ct. 75.

In relation to the practice of the federal courts, the supreme court of the United States, under authority conferred by section 917 of the Revised Statutes, among other rules promulgated (in 1842) rule 90, which provides that:

"In all cases where the rules prescribed by this court or by the circuit court do not apply, the practice of the circuit court shall be regulated by the present practice of the high court of chancery in England, so far as the same may reasonably be applied consistently with the local circumstances and local conveniences of the district where the court is held, not as positive rules, but as furnishing just analogies to regulate the practice."

In regard to this rule, and its effect, the supreme court of the United States, in a note by the court to Thomson v. Wooster, 114 U. S. 112, 5 Sup. Ct. 792, said:

"Reference is made to the first edition of Daniell (published in 1837), as being, with the second edition of Smith's Practice (published the same year), the most authoritative work on English chancery practice in use in March, 1842, when our equity rules were adopted. Supplemented by the general orders made by Lords Cottenham and Langdale in August, 1841 (many of which were closely copied in our own rules), they exhibit that 'present practice of the high court of chancery in England' which, by our ninetieth rule, was adopted as the standard of equity practice in cases where the rules prescribed by the court, or by the circuit court, do not apply. The second edition of Mr. Daniell's work, published by Mr. Headlam in 1846, was much modified by the extensive changes introduced by the English orders of May 8, 1845, and the third edition by the still more radical changes introduced by the orders of April, 1850, the statute of 15 & 16 Vict. c. 86, and the general orders afterwards made under the authority of that statute. Of course, the subsequent editions of Daniell are still further removed from the standard adopted by this court in 1842; but, as they contain a view of the later decisions bearing upon so much of the old system as remains, they have, on that account, a value of their own, provided one is not misled by the new portions."

It has been often decided, in conformity to the very terms of the rule, that the practice of the high court of chancery in England is to be applied, not as controlling, but as furnishing just analogies to regulate the practice in courts of the United States, where the subject is not regulated by an act of congress or a rule promulgated by the supreme court. So far as the English practice is regulated by statutes or orders of court subsequent to the date of rule 90, such practice does not control the courts of the United States. Changes introduced into the English system of practice subsequent to the above date have not been adopted, and furnish no rule for the practice of this court.

The courts of the United States possess jurisdiction of a foreclosure suit only when between citizens of different states or when other ground of federal jurisdiction exists. It is obviously just

and proper that these courts, in administering the equitable remedy in foreclosure suits affecting real estate, should enforce the rights of both parties to the mortgage contract, as defined and regulated by statute of the state and as enforced by the state chancery courts, and for the same reason should adopt substantially the same practice as to the method of making the decree effective, so far as this may be done.

A lack of substantial conformity with statutory regulations of the state, in the foreclosure of a mortgage of real estate, would, or might, result in something more or less than the rights of the parties, as understood when the contract was executed. It would introduce "discordant elements" and confusion, the real intention of the parties being effectuated in one set of courts and denied in the other.

It must be borne in mind that the method of strict foreclosure was the ancient, and, in general, only, practice in England. By this remedy the equity of redemption existing in the mortgagor, after default in payment, was cut off or foreclosed, leaving the absolute title in the mortgagee, according to the conveyance. In such a case, the decree of the court did not affect the legal title, but left that just as vested by the mortgage conveyance, and merely extinguished the equity of redemption. Chancellor Kent (in 1832), speaking of this method of foreclosure, said:

"This is the English practice to this day, though sometimes the mortgagee will pray for, and obtain, a decree for a sale of the mortgaged premises, under the direction of an officer of the court, and the proceeds of the sale will, in that case, be applied towards the discharge of incumbrances according to priority." 4 Kent, Comm. 181.

Under this practice, the court was not concerned with the passing or transfer of title, there being no sale.

The limited extent to which jurisdiction to order a sale was exercised in exceptional cases was hardly sufficient to make the question of passing the title very serious. The method would necessarily vary somewhat with the special facts and conditions, which made the exception. The difficulty in the method of ordering conveyances executed by the parties to the suit, as applied to married women, infants, lunatics, and persons residing beyond the territorial jurisdiction of the court, or absconding, is quite evident; and, although this may be regarded as the original practice, it was cumbersome, costly, and ineffectual, and has never been generally adopted or in vogue in this country. In justification of such a practice, it may be remarked that the court of equity was constantly undertaking to maintain a distinction between its decree and methods of execution and the judgment at law and process thereon. The judgment at law operated in its execution against property, while, agreeably to the ancient maxim, the decree in equity was executed by process in personam. This maxim was resorted to, also, as a basis for the proposition that, to entitle a court of equity to maintain a bill for the specific performance of a contract respecting land, it was not necessary that the land should be situated within the jurisdiction, but that, with the parties resident within the territorial jurisdiction of the court, per-

formance might be decreed in relation to land situate in a foreign country. This self-imposed limitation became to an extent an obstruction to the court's power to model its decrees and process to meet the requirements of a case,—a power which it has otherwise always claimed and exercised as a distinguishing feature of that court. It is to be remarked, further, that the practice was not of statutory origin, but such as the court adopted for itself. It is to be remembered, too, that the object of such methods as attachment for contempt, etc., was to compel the execution of a conveyance and a transfer of title. The methods, therefore, were indirect, and would be entirely unsatisfactory, in the light of the direct, less costly, and more efficacious methods of our own time.

In 1 Daniell, Ch. Prac. (1837) p. 228, it is said that, where an estate of an infant was decreed to be sold, a day was given the infant to show cause, after attaining full age, and a direction was generally inserted in the decree that in the meantime the purchaser should enjoy the estate against the infant until he attained such age, and that a purchaser buying such estate under such a decree must accept the order of the court for a future conveyance as a sufficient security. In the later and sixth edition of the same work, it is declared that:

"Formerly, a decree in a court of equity, unless it was for land, operated only in personam, and the only method of enforcing it was by process of contempt against the party disobeying it, under which the party, if arrested, might be kept in prison till he obeyed." 2 Daniell, Ch. Prac. p. 1032.

It is further pointed out that, in case a party refusing to obey the decree could not be arrested, or, having been arrested, remained in prison without obedience, a writ of sequestration might issue putting a commissioner in possession of the property of the defendant, and the rents and profits of his real estate, until he had cleared his contempt; and the sequestration process, it is said, had become the usual course of proceeding. The method of compelling obedience to a decree in England was originally like that for compelling appearance or answer, and was limited to process of contempt. Adams, Eq. pp. 393, 324. "It is obvious," says the critical author of the work just cited, "from the nature of the process of contempt, that, if a defendant absconded so as to avoid its operation, or if, when arrested under it, he perversely refused to submit, there were no means of compelling obedience; and, on the other hand, if a defendant in custody under process were incapable of doing the required act, his committal was practically imprisonment for life. * * * The inefficacy of the process of contempt for compelling a perverse defendant to obey has been already commented on, as well as the remedies which have been provided in respect to appearance and answer." Id. pp. 326, 394. The observations thus made related to the practice as it was down to 1841, with only slight changes in the remedies by statute. The English treatise by Adams, recognized as a work of first merit, was under preparation from 1842 to 1848, and published in 1850. It would be surprising to find that the equity courts of the United States, after more than half a century of progress, are adhering exclusively to, and restricted by, a method of procedure thus criticised in its own time and country, and long practically aban-

doned in England. The inefficacy of such methods becomes striking-
ly apparent in view of the increased extent to which mortgage con-
tracts enter into business transactions of the largest magnitude in
this country, and the extent to which the equity courts of the United
States are called upon to enforce such contracts by judicial sale.

The reason why sale upon foreclosure could not be had is stated
in Adams, Eq. (8th Ed.) pp. 119–121, as follows:

"It must be observed that the right of the mortgagee on such a bill is a
right merely to foreclose the equity, and does not extend to warrant a sale;
for, although a sale would be often more convenient than a foreclosure, yet
it is not stipulated for by the contract, and the court has no more authority
to sell the mortgaged estate for payment of the debt than to sell the mortgagor's
other estates for the same purpose. * * * In Ireland and some of the Ameri-
can courts a different rule prevails, and the mortgagee may in all cases require a
sale. If an express power of sale is given by the mortgage, such a power
forms an additional remedy for the mortgagee, and does not interfere with
his right to foreclose."

This method of foreclosure is commonly called "strict foreclo-
sure," in contradistinction to the practice of equity foreclosure by
judicial sale of the property for the payment of the debt, by which
the mortgagor receives the benefit of the surplus, if any, in the
proceeds of sale. The English system of strict foreclosure has nev-
er, as I have said, been generally adopted or followed in this coun-
try, in the courts of the states or the courts of the United States.
At an early day in some New England states, and now in a few
exceptional cases, the practice was and is followed. Whether due
to the fact that no sale was stipulated for in the mortgage or not,
the practice of strict foreclosure continued to be the general Eng-
lish practice down to the time of the chancery procedure act (called
also "Chancery Improvement Act") of 1852 (15 & 16 Vict. c. 86),
when power was conferred upon the chancery court to direct a
sale on the hearing, in suit for foreclosure, upon the request of
the mortgagee, mortgagor, or any subsequent incumbrancer, and
the power of the court in this respect was further enlarged, by the
Conveyancing and Law of Property Act of 1881, so as to extend the
power of sale to redemption suits, enabling any person entitled to
redeem to have an order of sale instead of redemption; but these
changes in remedy and procedure in the English equity system
have not, as stated, been adopted, and do not control or regulate
the practice of the circuit courts of the United States. The pres-
ent English practice is regulated by the conveyancing act of 1881
(which repealed the prior enactment), and by subsequent statutes
and orders and rules. It would serve no useful purpose in this
case to review this legislation, or to state, in detail, the existing
English practice. The practice will be found fully stated in the
standard English work on Vendors and Purchasers by Dart (6th
Ed.; 1888) pp. 1313–1353. After pointing out the method of or-
dering conveyance by the parties to the suit with contempt process
on refusal, the author gives the alternative modern method of deal-
ing with the subject in this language:

"But the more usual course of proceeding, where a party to the suit refuses
to execute, has been to treat such party as a trustee, within the trustee act

of 1850, and to obtain an order for a conveyance, or a vesting or releasing order having the effect of a conveyance; and this course may be adopted when the recusant party is a married woman, infant, lunatic, or mere tenant for life; and the mere decree, directing a sale and all proper parties to convey, makes the owner of the legal estate, if party to the suit, a trustee, within the act. Where property was sold in lots to several purchasers, it was held that each purchaser might separately petition for an order vesting the estate of an infant, and that the vendors must pay the costs. And now, where any person neglects or refuses to comply with a judgment or order directing him to execute any conveyance, the court may, on such terms and conditions as may be just, order that such conveyance shall be executed by such person as the court may nominate for that purpose, and the conveyance so executed will have the same effect as if the person originally directed to execute it had done so." 2 Dart, Vend. pp. 1347, 1348.

Under the existing practice in England, as a general rule, no party to the suit is allowed to bid for the estate without the previous permission of the court to do so; and in Mining Co. v. Mason, 145 U. S. 361, 12 Sup. Ct. 899, exception was taken to the sale, and error assigned on the ground that complainants in the cause had bid at the sale and become purchasers without obtaining previous permission of the court to do so, agreeably to the English practice. In overruling this objection, Mr. Justice Brewer, speaking for the court, said:

"The English practice does not obtain in this country. A sale made by a special master, under the directions of a court of chancery, is not a sale made by either of the parties to a litigation or under his direction. The master is a representative of the court, as a marshal or sheriff is in an action at law. He is not under the control of either party. He is not the agent of either to make the sale. At such public judicial sale, either party, as a rule, may bid. Richards v. Holmes, 18 How. 143; Smith v. Black, 115 U. S. 308, 6 Sup. Ct. 50; Allen v. Gillette, 127 U. S. 589, 8 Sup. Ct. 1331; Smith v. Arnold, 5 Mason, 414, 420, Fed. Cas. No. 13,004. In that case Judge Story said: 'In sales directed by the court of chancery, the whole business is transacted by a public officer, under the guidance and superintendence of the court itself. Even after the sale is made, it is not final until a report is made to the court, and it is approved and confirmed.' "

It would not be insisted that the courts of the United States are limited by the English remedy of strict foreclosure, as understood and defined, at the time of the adoption of the English practice, by rule 90; but such a result follows logically, if the contention before the supreme court is tenable. If this were so, the courts of the United States are without power, in the ordinary case, to do more than extinguish the right of redemption by the method of strict foreclosure. But in this country mortgages are executed, and have been from the earliest time, with power of sale, and the practice of strict foreclosure is entirely inapplicable, except in a few states and in a very limited class of cases. The mortgage in this country expressly providing for sale, and being regarded as security for the debt, the right to a judicial sale is an obligation or term of the contract. "It follows from the nature of the security, and arises upon its face, unless restrained by its terms." Railroad Co. v. Fosdick, 106 U. S. 68, 1 Sup. Ct. 10. To deny a sale would be a refusal to execute or enforce the contract. The decree requires a sale, and the practice of compelling conveyance by the parties, in a case where no sale is required, is not followed. In

relation to this point, see Miller v. Sherry, 2 Wall. 238, cited elsewhere herein. Such practice cannot, in the language of rule 90, "reasonably be applied consistently with the local circumstances and local conveniences of the district" where this court is held.

Power-of-sale mortgages are now in vogue in England, and well-nigh every mortgage contains the power of sale, and such a power, if not contained in the mortgage, is supplied by statute (Act 1860, superseded by Act 1881), unless the power is negatived or modified in the mortgage deed. The practice has changed accordingly. Mr. Justice Story, in the last edition of the Commentaries on Equity Jurisprudence, revised by the author and published in 1846, after his death, referring to the practice in England, and to certain special cases in which the rule of strict foreclosure was departed from, and a compulsory sale decreed, said:

"It is difficult to perceive any solid or distinct ground upon which these exceptions stand, which would not justify the courts of equity in England in decreeing a sale at all times when it is prayed for by the mortgagee, or when it would be beneficial to the mortgagor. The inconveniences of the existing practice of foreclosure in that country are so great that it has become a common practice to insert in mortgages a power of sale upon default of payment; and, although Lord Eldon at first intimated an opinion unfavorable to such a power as dangerous, it is now firmly established." 2 Story, Eq. Jur. § 1027.

The accepted doctrine in this country is that a court of equity, independently of statute, has jurisdiction to direct or decree a sale upon foreclosure. 2 Jones, Mortg. (5th Ed.) § 1573; 2 Story, Eq. Jur. §§ 1024–1026; Lansing v. Goelet, 9 Cow. 346; 9 Enc. Pl. & Prac. p. 262. And this is done regardless of any distinction whether the power of sale is contained in the mortgage or not. And it would seem to be elementary that, when the court is vested with jurisdiction to foreclose the mortgage and make a sale, this jurisdiction carries with it the power to adopt all forms and methods of practice necessary to the effective exercise of that jurisdiction.

In Tennessee, at an early day, the courts refused to accept or administer the harsh remedy of strict foreclosure, as known to the English practice. In the early case of Hord v. James (1805) 1 Overt. 201, the supreme court of Tennessee, rejecting this ancient method of foreclosure said:

"Consistently with the law, as laid down in all the modern books, we cannot vest the title in the complainant. The land, or part of it, must be sold at public sale, and the money applied to the payment of the debt and interest. The property may be of much greater value than the debt and interest, and it would be most unjust to vest the whole of it in the plaintiff, when the mortgage was only intended to secure a debt. It would be equally unjust to decree the property in full satisfaction, for it may be of less value than the debt and interest. Let it be sold, observing the directions of the acts of assembly in relation to the sale of real property under execution."

It will be noticed that in this case the court recognized the power to make the jurisdiction effective by ordering a sale upon foreclosure in accordance with the statutory regulation of sales upon execution.

In Williamson v. Berry (decided in 1850) 8 How. 545, Mr. Justice Wayne, discussing one of the points in the case, said:

"It involves what has been the practice in courts of equity, which, from long standing, habitual use, and uniform judicial acquiescence, has become law,—law in England, law in New York, law for the courts of equity of the United States, and law in every state of the Union, except as it may have been modified by the legislation of the states. The usual mode of selling property under a decree or order in chancery is a direction that it shall be sold with the approbation of a master in chancery, to whom the execution of the decree in that particular has been confided. It matters not whether the sale is public, or private, by a person authorized to make it. Not that the approbation of the master in either case completes a title to a purchaser. It is only the master's approval of the sale, and is one step towards a purchaser's getting a title. Before, however, a purchaser can get a title, he must get a report from the master that he approves the sale, or that he was the best bidder, accordingly as the sale may have been made either privately or at auction. That report, then, becomes the basis of a motion to the court, by the purchaser, that his purchase may be confirmed. Notice of the motion is given to the solicitors in the cause, and confirmation nisi is ordered by the court, to become absolute in a time stated, unless cause is shown against it. Then, unless the purchaser calls for an investigation of the title by the master, it is the master's privilege and duty to draw the title for the purchaser, reciting in it the decree for sale, his approval of it, and the confirmation by the court of the sale, in the manner that such confirmation has been ordered."

Is the conveyance prepared by the master to be executed by him or others? It might be said this precise point was left open by this statement of the practice, but, as the general law in this country is recognized as also that controlling in the courts of equity of the United States, the answer to the question suggested would not seem to be difficult.

In Lansing v. Goelet, 9 Cow. 346, Chancellor Jones, having first established the proposition beyond all reasonable question that jurisdiction to order a sale instead of strict foreclosure is original and inherent in equity, states the practice as follows:

"A judicial sale of the estate under the decree of the court, then, if the court has the power to make the decree, whether it be in form of a decree of sale preceded by a formal decree of foreclosure, or in the form of a decree for sale without a formal decree of foreclosure, effectually bars the right of the mortgagor to redeem; and the purchaser will hold it, under the title he acquires to it by virtue of the sale, and the conveyance he receives from the master, free and discharged from the equity of redemption. The purchase money then stands in the place of the estate, and will be applicable, as that was, first to the satisfaction of the debt to the mortgagee, and the overplus and residue, if any, to the use of the mortgagor; and, if the produce proves insufficient to satisfy the debt, he will remain personally liable for the deficiency.

"But the authority of this court to decree the sale of mortgaged premises for the satisfaction of the debt, which thus has its foundation in the principles of equity applicable to the contract of lender and borrower and the general jurisdiction of the court, is, moreover, recognized and sanctioned by the legislature. The eleventh section of the act concerning the court of chancery (1 Rev. Laws, p. 486) declares that all sales of mortgaged premises, under any decree of the court of chancery, shall be made, and deeds executed for the same, by one of the masters of the court; and that such deeds shall be as valid as if the same had been executed by the mortgagor and mortgagee, and shall be an entire bar against each of them, and their heirs, respectively, both in law and equity."

Substantially the whole of the first paragraph of this language taken from Lansing v. Goelet was adopted by the supreme court of the United States in Simmons v. Railway Co., 159 U. S. 288, 16 Sup. Ct. 1.

96 F.—56

The power to adopt reasonable and suitable methods of practice in the exercise of a conceded jurisdiction is inherent in the court of equity, and in all courts, and statutes do not confer the power to adopt practice, but simply regulate that practice, so far as the statute, in terms, embraces the subject. It will be perceived that Chancellor Jones, in Lansing v. Goelet, was declaring the general practice in courts of equity in this country, which he said had been recognized and sanctioned by statute in the state of New York. The practice is regulated by statutes in many states. Of such enactments it is said:

"When provisions in detail are made on this subject, they are generally founded upon principles and rules of practice already established by courts of equity under the general jurisdiction they have always exercised of the subject, and the powers of these courts are only enlarged and defined by the statutes." 2 Jones, Mortg. (5th Ed.) § 1443.

In a recent work, by an author whose ability and long experience as United States District Judge qualify him to speak upon the subject, the practice of the courts of the United States in mortgage foreclosure and like cases is laid down as follows:

"Upon the filing of the report of a sale, a motion for the confirmation thereof should be filed, upon which the court will make an order that exceptions to the sale must be filed within a given time. If exceptions to such sale are filed, and for cause sustained, or if the court, of its own motion, deems the sale to be faulty in form, or inequitable in substance, the same will be set aside, and a resale be ordered. If exceptions are not filed, and cause to the contrary does not appear, the court, at any time after the expiration of the time for filing exceptions, may approve the report and confirm the sale, and order a conveyance of the property executed by the master to be delivered to the purchaser. If the sale is subject to redemption, the conveyance cannot be delivered until the expiration of the time of redemption. In such cases the master should execute a certificate of purchase, and deliver the same to the purchaser. Upon the expiration of the period of redemption, if redemption has not been made, a brief report showing the fact, with the proper master's deed, should be submitted to the court for its approval, and for the order of delivery." Shiras, Eq. Prac. (2d Ed.; 1898) p. 138.

As I have said, it is desirable, from any point of view, that the practice in the courts of the United States, in all that relates to foreclosure sales of real estate, should conform substantially to the remedy obtaining by statute in the courts of the state. The confusing and discordant results of different methods in this regard in the courts of the state and those of the United States within the state are obvious, and the right to adopt or follow substantially the state practice, as regulated by statute in this respect, in the courts of the United States, was declared in Brine v. Insurance Co., 96 U. S. 627. It was adjudged in that case that the statute of the state of Illinois securing to the mortgagor the right to redeem within 12 months after decree on foreclosure was as obligatory on the federal courts sitting in equity in that state as it was on the state courts, and that the rules of practice in the courts of the United States must be made to conform to the law of the state, so far as it was necessary to give full effect to this statutory right of redemption. Although this was the point under consideration, the doctrine laid down was much broader than the limits of

the particular question called for. Mr. Justice Miller, delivering the opinion of the court, said:

"It is denied that these statutes are of any force in cases where the decree of foreclosure is rendered in a court of the United States, on the ground that the equity practice of these courts is governed solely by the precedents of the English chancery court as they existed prior to the Declaration of Independence, and by such rules of practice as have been established by the supreme court of the United States, or adopted by the circuit courts for their own guidance. And treating all the proceedings subsequent to a decree which are necessary for its enforcement as matter of practice, and as belonging solely to the course of procedure in courts of equity, it is said that not only do the manner of conducting the sale under a decree of foreclosure, and all the incidents of such a sale, come within the rules of practice of the court, but that the effects of such a sale on the rights acquired by the purchaser, and those of the mortgagor and his subsequent grantees, are also mere matters of practice, to be regulated by the rules of the court, as found in the sources we have mentioned. On the other hand, it is said that the effect of the sale and conveyance made by the commissioner is to transfer the title of real estate from one person to another, and that all the means by which the title to real property is transferred, whether by deed, by will, or by judicial proceeding, are subject to, and may be governed by, the legislative will of the state in which it lies, except where the law of the state on that subject impairs the obligation of a contract; and that all the laws of a state existing at the time a mortgage or any other contract is made, which affect the rights of the parties to the contract, enter into and become a part of it, and are obligatory on all courts which assume to give remedy on such contracts. We are of opinion that the propositions last mentioned are sound; and, if they are in conflict with the general doctrine of the exemption from state control of the chancery practice of the federal courts, as regards mere modes of procedure, they are of paramount force, and the latter must, to that extent, give way. It would seem that no argument is necessary to establish the proposition that when substantial rights, resting upon a statute, which is clearly within the legislative power, come in conflict with mere forms and modes of procedure in the courts, the latter must give way, and adapt themselves to the forms necessary to give effect to such rights. The flexibility of chancery methods, by which it molds its decrees so as to give appropriate relief in all cases within its jurisdiction, enables it to do this without violence to principle. If one or the other must give way, good sense unhesitatingly requires that justice and positive rights, founded both on valid statutes and valid contracts, should not be sacrificed to mere questions of mode and form."

The doctrine of this case was reaffirmed in Langdon v. Sherwood, 124 U. S. 74, 8 Sup. Ct. 429. In that case the following section in the Code of Nebraska was under consideration:

"When any judgment or decree shall be rendered for a conveyance, release or acquittance in any court of this state, and the party or parties against whom the judgment or decree shall be rendered do not comply therewith within the time mentioned in said judgment or decree, such judgment or decree shall have the same operation and effect, and be as available, as if the conveyance, release or acquittance had been executed conformable to such judgment or decree." Code Civ. Proc. § 429b.

It will be noted that the similarity between this statute and the third method of transferring title provided for by the Tennessee act is quite close and striking. It was held that a judgment or decree rendered in the circuit court of the United States for the district of Nebraska, in respect to real estate situated in Nebraska, in conformity with this statute, operated to transfer the title to the estate which was the subject of the judgment or decree, upon the failure of the party to convey as ordered.

"We are of opinion," said Mr. Justice Miller, speaking for the court, "that, if this section of the Code be valid, it was the intention of the makers of it that a judgment and decree, such as the one before us, should have the same effect, where the parties directed to make the conveyance fail to comply with the order, as it would have had if they had complied, in regard to the transfer of title from them to the party to whom they were bound to convey by the decree. The language of this section of the Code hardly admits of any other construction. When the party decreed to make the conveyance does not comply therewith within the time mentioned in the judgment or decree, such judgment or decree shall have the same effect and operation and be as available as if the conveyance had been executed. The operation or effect here meant was the transfer of title, and it could not have been made any clearer if it had said that it should have the effect of transferring the title from the party who fails to convey to the one to whom it ought to be conveyed. This must have been the meaning, in the minds of the legislators. It was undoubtedly the ancient and usual course in such a proceeding to compel the party who should convey to perform the decree of the court by fine and imprisonment for refusing to do so. But inasmuch as this was a troublesome and expensive mode of compelling the transfer, and the party might not be within reach of the process of the court, so that he could be attached, it has long been the practice of many of the states, under statutes enacted for that purpose, to attain this object either by the appointment of a special commissioner who should convey in the name of the party ordered to convey, or by statutes similar to the one under consideration, by which the judgment or decree of the court was made to stand as such conveyance, on the failure of the party ordered to convey. The validity of these statutes has never been questioned, so far as we know, though long in existence in nearly all the states of the Union. There can be no doubt of their efficacy in transferring the title, in the courts of the states which have enacted them, nor do we see any reason why the courts of the United States may not use this mode of effecting that which is clearly within their power. The question of the mode of transferring real estate is one peculiarly within the jurisdiction of the legislative power of the state in which the land lies. As this court has repeatedly said, the mode of conveyance is subject to the control of the legislature of the state; and as the case in hand goes upon the proposition that the title had passed from the government of the United States, and was in controversy between private citizens, there can be no valid objection to this mode of enforcing the contract for conveyance between them according to the law of Nebraska. U. S. v. Crosby, 7 Cranch, 115; Clark v. Graham, 6 Wheat. 577; McCormick v. Sullivant, 10 Wheat. 192; U. S. v. Fox, 94 U. S. 315; Brine v. Insurance Co., 96 U. S. 627; Insurance Co. v. Cushman, 108 U. S. 51, 2 Sup. Ct. 236. We cannot see, therefore, any error in the circuit court in permitting the proceedings in the chancery suit to be given in evidence, nor in giving to them the effect of transferring from the Sauntee Land & Ferry Company such legal title as it had to any of the property in controversy."

Brine v. Insurance Co. has been reaffirmed and applied in Bendey v. Townsend, 109 U. S. 668, 3 Sup. Ct. 482; Allis v. Insurance Co., 97 U. S. 145; Barnitz v. Beverly, 163 U. S. 127, 16 Sup. Ct. 1045; and De Vaughn v. Hutchinson, 165 U. S. 570, 17 Sup. Ct. 461.

In Barnitz v. Beverly, the court expressly adopted the language of the Brine Case, which bears more directly upon the point now in judgment. Mr. Justice Shiras, speaking for the court, said:

"The view of the trial court was that remedy of an immediate sale, by decree of the circuit court of the United States sitting in equity, was not affected by the state statute. But this court held, through Mr. Justice Miller, that all the laws of a state existing at the time a mortgage or any other contract is made, which affect the rights of the parties to the contract, enter into and become a part of it, and are obligatory on all courts which assume to give a remedy on such contracts; that the construction, validity, and effect of contracts are governed by the place where they are made and are to be

performed, if that be the same; that it is therefore said that these laws enter into, and become a part of, the contract. In the opinion it was said: 'There is no doubt that a distinction has been drawn, or attempted to be drawn, between such laws as regulate the rights of the parties and such as apply only to the remedy. It may be conceded that in some cases such a distinction exists. In the recent case of Tennessee v. Sneed, 96 U. S. 69, we held that, so long as there remained a sufficient remedy on the contract, an act of the legislature, changing the form of the remedy, did not impair the obligation of the contract. But this doctrine was said to be subject to the limitation that there remained a remedy which was complete, and which secured all the substantial rights of the party. At all events, the decisions of this court are numerous that the laws which prescribe the mode of enforcing a contract, which are in existence when it is made, are so far a part of the contract that no changes in these laws which seriously interfere with that enforcement are valid, because they impair its obligation, within the meaning of the constitution of the United States.' "

See, also, Flagg v. Walker, 113 U. S. 659, 5 Sup. Ct. 697.

Benedict v. Railroad Co., 19 Fed. 173, was a case in the United States circuit court for the district of Kansas, Judge McCrary presiding. Under the statute of Kansas, no order for the sale of railroad property mortgaged with a waiver of appraisement could be made by the court until the expiration of six months after the decree of foreclosure. It was held that this statute regulated the transfer of land within the state, and was therefore binding on the federal courts. It was declared to be the settled practice of the United States courts to follow a statute of that kind in foreclosure cases, the court citing, in support of the ruling, the cases of McGoon v. Scales, 9 Wall. 23, and Brine v. Insurance Co. See, also, to the same effect, Dow v. Railroad Co., 20 Fed. 260. Indeed, the local law and the local method of enforcing a contract, as applied to a mortgage on land, has been so generally recognized in all jurisdictions that, under the ancient English practice, when strict foreclosure was the rule, one of the classes of cases in which that rule was departed from, and a sale decreed, was declared to be "where the mortgage is of land, and by the local law is subject to a sale; such as, for example, in Ireland and America." 2 Story, Eq. Jur. § 1026.

It would perhaps not add materially to what has been said as to the settled practice in the courts of the United States to point out that in well-nigh all of the adjudged cases, as in Simmons v. Railway Co., supra, deeds were, conformably to this practice, executed by masters making the sales to the purchasers, conveying, in terms, an absolute title to the property sold. It is true that these cases do imply an interpretation by those courts of their own power and practice in that regard, and a construction by those courts of their own powers and practice will, by comity, be recognized by other courts.

What has been thus far said is with a view to justify the established practice in this court, as regular and sanctioned by the adjudged cases, and such as would be sustainable in direct attack on appeal. This is the question raised by the master's request for instruction. In a case where real estate is situated within the territorial jurisdiction of the court, and the parties to the suit are regularly before the court, the validity of a sale made in the method in question ought never, it would seem, to have presented serious difficulty in a collateral inquiry.

The question pending before the supreme court of Tennessee, as I am advised, arises in an action of ejectment, and the attack upon the sale is collateral. Precisely such a question was presented in Miller v. Sherry, 2 Wall. 238, and decided by the supreme court of the United States. The action in that case was in ejectment, and the title of the plaintiff rested on a sale made and deed executed by a master in chancery under decree of the court. The insistence in that case was that a court of equity could only compel parties to convey the legal title. This contention was overruled. Mr. Justice Swayne, delivering the unanimous judgment of the court, said:

"The court had full jurisdiction, both as to the parties and the property. The decree was regularly entered, and the sale and conveyance by the master to Bushnell were made in pursuance of it. The only objection to the proceedings is that Williams, in whom was vested the legal title, was not ordered to convey, and did not convey. A conveyance by him was not necessary. Where a court of equity has jurisdiction, as in this case, a sale and conveyance in obedience to a decree is as effectual to convey the title as the deed of a sheriff made pursuant to a sale under an execution issued upon a judgment at law. When the object of the suit is to compel the conveyance of the legal title by the defendant, and the decree does not require a sale, the title will not pass until the deed is executed, unless it be provided, as has been done in some of the states, by statute, that the decree itself shall operate as a conveyance. In all such cases, the court has power to compel the defendant to convey. When the property is beyond the local jurisdiction of the court, and the defendant is before it, the court can compel him to convey, as it may direct, for any purpose within the sphere of its authority. This is an ordinary exercise of the remedial jurisdiction of those courts, and the power is one of the most valuable attributes of the equity system. The principle of those cases has no application here."

In this country, as I have already remarked, mortgages contain the power of sale, and, the legal title being vested in the mortgagee, there is in such a contract a stipulation on the part of the mortgagor that sale may be made and title passed. The power of sale implies this much. He, therefore, consents to such a sale in advance, and when, at the suit of the mortgagee, a judicial sale is made, it would seem too clear for argument that it passes to the purchaser at such sale all the rights of the mortgagee, however irregular the sale may have been. It was accordingly so adjudged in an action in ejectment in Brobst v. Brock, 10 Wall. 519. And an irregular judicial sale made at the suit of the mortgagee is effectual to pass all the mortgagee's rights to the purchaser, although such sale may be no bar to the equity of redemption. Bryan v. Brasius, 162 U. S. 415, 16 Sup. Ct. 803. In this case the question arose in an ejectment suit. It would seem quite clear that, when the court possesses full jurisdiction to render a final decree, the methods by which such decree may be executed present questions which affect procedure only, and do not touch the jurisdiction of the court. The distinction between the validity of a judicial proceeding, when called in question by direct proceeding to set aside or annul, and by collateral attack, while recognized at an early day, was not always attentively observed in the older cases. But the importance of such a distinction has become fully understood, and is closely enforced in the adjudged cases of our own time. No court has stated this distinction more clearly, or

adhered to it more consistently, than the present supreme court of Tennessee. Robertson v. Winchester, 85 Tenn. 171, 1 S. W. 781; Reinhardt v. Nealis, 101 Tenn. 169, 46 S. W. 446, and cases cited.

The inherent power of a court of equity to apply a remedy which is co-extensive with its jurisdiction over the subject-matter is not denied, and the only suggestion made against the power to mold its decree and model its procedure, so as to give effect to the remedy provided by statute of the state for the enforcement of a mortgage on land situated in such state, is the ancient maxim that the general jurisdiction in equity is exercised in personam, and not in rem. I do not now stop to discuss how far that maxim has lost its importance. By equity rule 8, the supreme court of the United States has provided that "final process to execute any decree may, if the decree be solely for the payment of money, be by writ of execution, in the form used in the circuit court in suits at common law in actions of assumpsit." The maxim is made the basis of text-book statement against the power of the United States courts generally to transfer title, otherwise than by deed executed by the parties under order of the court, consistently with the ancient English practice. A statement to this effect may be found in 3 Pom. Eq. Jur. § 1317, and Watkins v. Holman's Lessee, 16 Pet. 25, 26, and some other federal cases are cited as supporting the statement. Examination of those cases will disclose that their facts did not call for an opinion on the broad question of the court's power in cases generally, and the question under consideration in the case at bar was neither considered nor decided. In Watkins v. Holman's Lessee it was decided that a court of chancery, acting in personam, might well decree the conveyance of land situated in another state, and enforce the decree by process against the defendant properly before the court. It was further held that neither the decree itself, nor the conveyance under it, except by the person in whom the title was vested, could operate beyond the jurisdiction of the court. In other words, it was declared that such a decree could not operate beyond the territorial limits of the state in which it was pronounced, and that the decree could not, of itself, transfer title to land situate in another state. The proposition that, to entitle a court of equity to maintain a bill for specific performance or other similar relief relating to land, it is not necessary that the land should be situate within the jurisdiction where the suit is brought, was considered in different aspects in the other federal cases cited. This general doctrine was more clearly brought out, and its limits illustrated and defined, in the later cases of Carpenter v. Strange, 141 U. S. 87, 11 Sup. Ct. 960, and Dull v. Blackman, 169 U. S. 243, 18 Sup. Ct. 333. In Carpenter v. Strange the court said:

"The real estate was situated in Tennessee, and governed by the law of its situs, and while, by means of its power over the person of a party, a court of equity may, in a proper case, compel him to act in relation to property not within its jurisdiction, its decree does not operate directly upon the property, nor affect the title, but is made effectual through the coercion of the defendant, as, for instance, by directing a deed to be executed or canceled by or on behalf of the party."

So, in Dull v. Blackman, Mr. Justice Brewer, for the court, said:

"Upon these facts, we remark that as the land, the subject-matter of this controversy, was situate in Iowa, litigation in respect to its title belonged properly to the courts within that state (Ellenwood v. Chair Co., 158 U. S. 105, 107, 15 Sup. Ct. 771), although, if all the parties interested in the land were brought personally before a court of another state, its decree would be conclusive upon them, and thus, in effect, determine the title. The suit in New York was one purely in personam."

The lack of power to give to the decree extraterritorial effect is not a lack of jurisdiction. "The incapacity to enforce the decree in rem constitutes no objection to the right to entertain such a suit. Where, indeed, the lands lie within the reach of the process of the court, courts of equity will not exclusively rely on proceedings in personam, but will put the successful party in possession of the lands, if the other party remains obstinate, and refuses to comply with the decree." 2 Story, Eq. Jur. § 744. But the principle of those cases has no application to a case like the one at bar, in which the real estate is situated in the same jurisdiction where the suit is brought, and where, in the ordinary case, the parties to be affected are also residents within such jurisdiction and before the court. On the contrary, as has been seen, when the question now under consideration came before the supreme court of the United States, it was decided, in more than one case, in favor of the power of a court of equity to make sale and conveyance by a master in chancery, and in that way to convey the title as effectually as the deed of a sheriff made pursuant to execution on a judgment at law. Furthermore, however it may once have been, this maxim, "Æquitas agit in personam," has now no application to a judicial sale upon foreclosure, which is a proceeding partly in rem and partly in personam; the object being the seizure and sale of the property, and a deficiency judgment for any part of the debt not satisfied by the proceeds of sale. 2 Jones, Mortg. § 1444; 2 Black, Judgm. 810; Ror. Jud. Sales (2d Ed.) § 53; 1 Beach, Mod. Eq. Jur. § 491; Stevens v. Ferry, 48 Fed. 9; 9 Enc. Pl. & Prac. 220.

When the notions of a mortgage so changed that it was no longer regarded as the conveyance of an estate upon condition, but as mere security for the debt, creating a lien, and when the power of sale was added, the action to foreclose by sale became obviously one in rem, or substantially such. By statute, in Tennessee (Shannon's Code, § 6115), it is enacted that a court of chancery acts ordinarily in personam, and that suit may be brought wherever the defendant is found; but by section 6121 it is further provided that bills to enforce specific execution of contracts relating to realty, or to foreclose a mortgage by sale of realty, shall be filed in the county in which the land or a material part of it lies, or in which the deed or mortgage is registered. Other sections provide for service by publication in the court of chancery, and it is hardly to be doubted that this legislation, making the venue local, also makes the suit one in rem. 11 Am. & Eng. Enc. Law (2d Ed.) p. 169, and cases cited. This is clearly so, as the legislation was produced by the cases of Avery v. Holland (1806) 2 Overt. 71, and Grace v. Hunt (1813) Cooke, 341, and changed

the doctrine of those cases. See Roper v. Roper, 3 Tenn. Ch. 55. And it has been repeatedly decided by the supreme court of Tennessee that a decree in chancery, resting on proceedings with constructive service, in conformity with these statutes, is valid, and that a purchaser at judicial sale under such decree acquires a good title. If the suit, as regulated by statute of the state, is a proceeding in rem, there is no reason why the courts of the United States, exercising jurisdiction in foreclosure cases within the state, should not treat the action accordingly, in the absence of special questions. See Wood v. Brady, 150 U. S. 23, 14 Sup. Ct. 6. In the leading case of Pennoyer v. Neff, 95 U. S. 727, the supreme court of the United States, discussing the validity of judgments and decrees resting upon constructive service of process, said:

"Such service may also be sufficient in cases where the object of the action is to reach and dispose of property in the state, or of some interest therein, by enforcing a contract or a lien respecting the same, or to partition it among different owners, or, when the public is a party, to condemn and appropriate it for a public purpose. In other words, such service may answer in all actions which are substantially proceedings in rem. * * * It is true that, in a strict sense, a proceeding in rem is one taken directly against property, and has for its object the disposition of the property, without reference to the title of individual claimants; but, in a larger and more general sense, the terms are applied to actions between parties, where the direct object is to reach and dispose of property owned by them, or of some interest therein. Such are cases commenced by attachment against the property of debtors, or instituted to partition real estate, foreclose a mortgage, or enforce a lien. So far as they affect property in the state, they are substantially proceedings in rem, in the broader sense which we have mentioned."

In the earlier case of Day v. Micou, 18 Wall. 162, suit to foreclose a mortgage was declared to be a proceeding in rem; and in the later case of Broom v. Armstrong, 137 U. S. 278, 11 Sup. Ct. 75, it was said of such a suit:

"It is therefore a proceeding in rem, as much so as an attachment suit against the property of an absent debtor or a suit instituted to partition real estate; and the property is within the power of the court until the judgment or decree is entered, so that the lien upon it may be enforced, as the statute requires."

See, also, Arndt v. Griggs, 134 U. S. 316, 10 Sup. Ct. 557.

Furthermore, congress has, by legislation, expressly recognized the foreclosure suit as being one in rem, and impressed upon it the essential features of a case of that class by conferring on the circuit courts of the United States jurisdiction to proceed with it as a suit of that character, giving effect to the judgment as one in rem. Rev. St. § 738 (18 Stat. 470); Act March 3, 1875 (18 Stat. 470) § 8, expressly saved by Act 1887, § 5, as corrected by Act 1888 (25 Stat. 433). The act, among other provisions not affecting the matter now considered, provides that, in any suit commenced in a circuit court of the United States to enforce any legal or equitable lien upon, or claim to, real estate within the district where the suit is brought, substituted service may be had upon any one or more of the defendants not an inhabitant of, or found within, the district, in the manner specifically provided; the statute further providing:

"It shall be lawful for the court to entertain jurisdiction, and proceed to the hearing and adjudication of such suit in the same manner as if such

absent defendant had been served with process within the said district; but such adjudication shall, as regards such absent defendant or defendants, without appearance, affect only the property which shall have been the subject of the suit and under the jurisdiction of the court therein, within such district."

The legislation expressly authorizing the enforcement of lien upon property in a case of nonresident or absent defendants, and limiting the effect of the decree or judgment to the property subject to the lien and within the jurisdiction of the court, it is hardly necessary to say such legislation would be idle, unless the court possesses the power to transfer title and deliver possession, as in other cases of suits in rem, without resort to secondary methods of enforcing the decree, such as formerly belonged to a suit in personam. In this connection, it is pertinent to remark that the supreme court of the United States, by equity rule 92, has taken the last step necessary to assimilate the procedure in suits for the foreclosure of mortgages in circuit courts of the United States to that now prevalent in the states, by authorizing a deficiency decree for any balance of the debt found due the complainant over and above the proceeds of sale, and issuance of execution for the collection of the same, just as in rule 8, where the decree is solely for the payment of money.

The act of congress authorizing constructive service was under consideration, in some of its applications, in Mellen v. Iron Works, 131 U. S. 352, 9 Sup. Ct. 781, Greeley v. Lowe, 155 U. S. 58, 15 Sup. Ct. 24, and Dick v. Foraker, 155 U. S. 404, 15 Sup. Ct. 124. Where the object of the suit is one within the act, it is equally applicable, whether the nonresident is the sole defendant or one of several defendants. It was so ruled in Dick v. Foraker. In Greeley v. Lowe, Mr. Justice Brown, delivering the judgment, said:

"Hence, it appears that the case of Smith v. Lyon really has no bearing, as that case involved only the rights of parties to personal actions residing in different districts to sue and be sued, and was entirely unaffected by the act of 1888, which deals with defendants only in local actions, and expressly reserves jurisdiction, if the suit be one to enforce a lien or claim upon real estate or personal property. * * * The act of 1875 gave the right to sue defendants wherever they were found. The act of 1888 requires that they shall be inhabitants of the district. But, in both cases, an exception is created in local actions, wherein any defendant interested in the res may be cited to appear and answer, provided he be not a citizen of the same state with the plaintiff."

In Morrison v. Marker, 93 Fed. 692, it was held that suit to remove cloud on title to real estate within the district was essentially a suit in rem, and within section 8 of the act of 1875. It is too clear to admit of question that the statute is applicable to a suit for the foreclosure by sale of a mortgage on realty in the district where suit is brought. It was accordingly so adjudged in Grove v. Grove, Id. 865, and Black v. Scott, 9 Fed. 186. It was treated as applicable to such a suit in Kuhn v. Morrison, 75 Fed. 81, though the question was not distinctly raised. See, also, Single v. Manufacturing Co., 55 Fed. 553; Cowell v. Water-Supply Co., 96 Fed. 769.

The title to properties of great magnitude within these districts rests on judicial sales made and title transferred by master's or commissioner's deed, and this is presumably true of other districts.

A decision adverse to the validity of such titles would produce widespread mischief and much litigation.

In view of what has been said, I conclude—First, that the established general practice in this country in judicial sales upon foreclosure is to direct sale to be made by a master named in the decree, and when the sale, upon report, is confirmed, to order a conveyance of the property executed by the master to be delivered to the purchaser, as stated by Judge Shiras in the work already referred to, and that the courts of the United States, in adopting such a practice, are not restricted by the maxim that jurisdiction in equity is ordinarily exercised in personam, because, apart from other reasons, the foreclosure suit is substantially a proceeding in rem; second, that, in a suit for the foreclosure of a mortgage executed upon real estate situate within the jurisdiction of the court, it is the right, and within the power, of a circuit court of the United States, if not its duty, to conform to any statutes of the state regulating the remedy for the enforcement of the mortgage contract, and that the practice of those courts in thus conforming to the local law is recognized as proper by the supreme court of the United States. The result is that the decree will devest and vest title, and direct the master to execute and deliver a deed to the purchaser for registration, as a muniment of title, agreeably to the practice long since adopted and followed in this court.